IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

ROBERT KLAUS,                          )
                                       )
     Plaintiff,                       )
                                       )
 v.                                    )          Case No. 17-3280
                                       )
SHAWN KAHL, Sheriff of Macoupin        )
County and MACOUPIN COUNTY,            )
ILLINOIS,                              )
                                       )
     Defendants.                      )

## OPINION

RICHARD MILLS, United States District Judge:

This is an action wherein Plaintiff Robert Klaus asserts a claim for wrongful termination under 42 U.S.C. § 1983.

Plaintiff's complaint also contains a state law wage claim under the Illinois Labor Act.

Pending is the motion for summary judgment of Defendants Shawn Kahl, Sheriff of Macoupin County, and Macoupin County, Illinois.

For the reasons that follow, that motion is allowed.

## I.     BACKGROUND

Introduction

Plaintiff Robert Klaus was hired by the Macoupin County Sheriff's Office as

a corrections officer in October 1989. Shawn Kahl currently serves as the elected Sheriff of Macoupin County. Sheriff Kahl started working in the Sheriff's Office in 2000 as a deputy, became a detective in September 2006, was a sergeant in road patrol and ran for sheriff in 2014.

Evan Ibberson is currently a Lieutenant Colonel in the Sheriff's Office and serves as the Jail Administrator.

<u>First Amendment claim</u>

Robert Klaus had originally worked as a corrections officer under Sheriffs Herbert Hoover, Jim Zirkelbach, Gary Wheeler and Don Albrecht. Under Sheriff Albrecht, there was a Jail Superintendent. Eleven corrections officers reported directly to the Jail Superintendent. Sheriff Albrecht served for nine years until the end of November 2014 when Sheriff Kahl was elected.

When Kahl announced he would run against Sheriff Albrecht, Albrecht retaliated by demoting Kahl from detective, took his squad car, took his phone and changed his work shift. Prior to the election, Kahl knew Klaus and had a civil working relationship with him but did not see him very often. Kahl lives within two blocks of Klaus. Kahl was aware that Klaus supported his opponent in the 2014 election. In March 2014, then-Sergeant Kahl defeated incumbent Sheriff Albrecht in the Democratic primary.

Immediately after his primary defeat, in April 2014, Sheriff Albrecht went from having no corrections sergeants to promoting 4 of the 11 corrections officers, including Klaus, to sergeant and giving them substantial salary increases. The positions were posted after the primary. Klaus applied by submitting a handwritten resume. There was no written exam or oral interview. Klaus opines that over the years, all past instances of promotions were politically motivated. Klaus acknowledged that his promotion could have been politically motivated.

Klaus was approached by a co-worker in December 2014 asking that he sign a letter stating that he had no confidence in Sheriff Albrecht and Klaus refused. It was the union that was trying to get rid of Albrecht. The Defendants state there is no evidence that Sheriff Kahl was aware of Klaus's refusal or that Kahl was involved in any efforts by the union to get rid of then-Sheriff Albrecht.

Following the primary election, Kahl (who was then a Sergeant in the Sheriff's Office) allegedly stated to Klaus that there was no need for sergeants to be promoted in the jail and Klaus disagreed. Sheriff Kahl recalls speaking with Klaus about the topic but denies ever saying that Klaus did not deserve being named a sergeant. Kahl was sworn in as Sheriff on December 1, 2014. After Sheriff Kahl took office, he did not demote Klaus or decrease his pay.

On December 2, 2014, Sheriff Kahl and Chief Deputy Quinn Reiher met with Klaus after learning from other employees that Klaus allegedly told them that he had

25 years in and just wanted to skate by and do his time. Klaus claims that during the meeting, Sheriff Kahl stated he heard that Klaus was going to sabotage him and that he was not going to work with the new sheriff. Klaus denied making those statements but said there was animosity against some of the guards in the corrections department who had not supported Sheriff Kahl in the election. Sheriff Kahl recalls telling Klaus, "This is your job, you need to do your job," but it was by no means any kind of reprimand.

During his deposition, Klaus testified that at one point in the December 2, 2014 meeting, Sheriff Kahl allegedly told him that if he did not comply with the rules, Kahl would terminate Klaus. At another point of the deposition, Klaus denied that Sheriff Kahl ever threatened to terminate him. After December 2, 2014, Sheriff Kahl did not ever threaten to terminate Klaus. Sheriff Kahl would come into the jail perhaps once or twice a month.

From the date that Sheriff Kahl took over in December 2014 through his retirement, Klaus never lost any income. Klaus was never suspended during his employment. Sheriff Kahl never terminated Klaus.

<u>Sex offender registration and taking bond money</u>

During the December 2, 2014 meeting, Sheriff Kahl told Klaus that he and Sergeant Dave Chiarodo were now going to register all sex offenders. Sheriff Kahl testified that when he was a detective, he did 95% of the sex offender registrations.

When he became sheriff, Kahl believed that the best way to handle this was to have someone who is always at the Sheriff's Office register sex offenders. Klaus and Chiardo were tasked to handle sex offender registration because registration is normally done in the morning and they were the only two daytime sergeants.

On July 20, 2015, Lt. Col. Evan Ibberson, who was the Macoupin County Jail Administrator, sent a memo to all corrections personnel concerning procedures for completing a Sex Offender Registration form. Sheriff Kahl sent Klaus to a sex offender class in Jerseyville. Klaus registered sex offenders very infrequently, less than five total, and it would take him 30-45 minutes to complete this task. Lt. Col Ibberson helped Klaus register sex offenders when he could. Klaus never had to work overtime because he was registering a sex offender. Klaus had to register sex offenders for four or five months before Sheriff Kahl changed the procedure, after which he no longer had to do it.

On February 11, 2015, Lt. Col. Ibberson issued a memo to dispatch and corrections which changed who was to take bond money. Klaus claims he was written up by Ibberson. The Defendants dispute he was written up on this issue. Previously dispatchers, deputies and courthouse employees took bond money. After February 11, 2015, corrections officers instead of dispatchers took bond money. Deputies and courthouse employees continued to take bond money as well. In addition to Klaus, ten other employees now had to take bond money and were

affected by this change. Klaus could not say how much extra time he might have spent taking bond money. Klaus felt that taking bond money was another duty he had to do that added to the time spent performing his other daily duties, such as court visitation, mail log-in and mail log-out.

Kahl has no knowledge of any disciplinary actions taken against Klaus before he became sheriff. Kahl has never reviewed Klaus's personnel file. No disciplinary action more than six months old can be used.

<u>Written reprimand or other corrective action</u>

On June 12, 2015, Klaus failed to put $9.91 in inmate cash into a trust account. He was written up for this. Klaus did not consider this to be a disciplinary issue. On July 6, 2015, Klaus forgot to take a report over to the State's Attorney's Office. This did not result in a reprimand.

On July 21, 2015, Lt. Col. Ibberson gave Klaus a written reprimand after he booked a female with warrants out of Macoupin and Montgomery County but only collected bond money for the Macoupin County warrant and released her while there was still an active warrant out of Montgomery County. Lt. Col. Ibberson testified Klaus was reprimanded because an officer taking bond money must doublecheck outstanding warrants. Normally, the warrant copy and the LEADS report from the state will show both warrants and, given that Klaus had worked there for a long time, he should have known to check. Klaus disagreed with the reprimand because he was

never given information on the Montgomery County warrant. Klaus did not lose any money from the reprimand. He believed that the written reprimand had a negative impact on his career because the reprimand was placed in his personnel file. The Defendants dispute that the written reprimand was negative to an extent that it would dissuade Klaus from politically supporting other candidates. Prior to this incident, moreover, Klaus had numerous write ups over the years in his personnel file and he was still promoted from corrections officer to sergeant.

Klaus alleges it was for dispatch to run the arrestees' information on LEADS and give this information to the jailor. Klaus alleges that, in the write-up over the release of a subject with the active county warrant, it was only after the arrestee was released that dispatch checked LEADS and informed Klaus there was a second warrant. The Defendants dispute this assertion and claim that, according to Lt. Col Ibberson, Klaus normally would be provided with both paperwork on the warrant as well as the LEADS printout which would have shown both warrants and it was Klaus's responsibility to double check information he may have been given by dispatchers.

A reprimand does not result in immediate termination unless it is for insubordination, which does result in termination. Pursuant to the union contract, progressive discipline started with a verbal reprimand, then a written reprimand, a second written reprimand, a third written reprimand and then further action past

three write ups.  Any corrective action is rolled off per the union contract once it is six months old.

On September 21, 2015, Klaus was given a written reprimand for releasing two people without photographing them.  The need for them to be photographed again is because they could change their appearance.  The reprimand warned that a recurrent problem may lead to suspension and/or dismissal.  Klaus admitted he agreed with the reason for the written reprimand.

Alleged verbal abuse

In early 2015, Klaus was working in the morning when inmates were trying to escape and had tried to pound a hole in the ceiling of the shower area.  Sheriff Kahl allegedly blamed Klaus's shift about it because they did not know or do anything about it.  At the time he learned of this incident, Sheriff Kahl allegedly told Klaus he was a do-nothing guard and he ought to retire and go home and do nothing.  Sheriff Kahl denies making this statement.  Kahl threatened Klaus with termination over claimed statements Klaus never made.  The Defendants dispute this statement.  Former Corrections Officer Robert Eskew, who did not support any candidate in the elections, testified that Sheriff Kahl yelled at him about the incident as well.

On one occasion, Lt. Col. Ibberson allegedly told Klaus "it's a long road, and it's going to be a tough haul."  Ibberson testified it was possible he said that it was going to be a long road if they don't see eye-to-eye a little bit better because there

was a perception that he was best friends with the Sheriff when he was not.  Klaus was told by another employee, or may have heard firsthand, that Lt. Col. Ibberson allegedly stated that the sergeants were going to earn their pay.  Klaus was offended by that statement.  On one occasion, Lt. Col. Ibberson allegedly stated to Klaus it was not right that union members got a big raise under the union contract and Ibberson did not get one.

Unpaid wage claim

Klaus alleges he was required to work off the clock without pay, including having to appear for work one half hour before a shift began.  The Macoupin County Sheriff's Department Policy Manual under Sheriff Wheeler, effective in May 2000, contained a provision, Section 6.034, Reporting for Duty.  Members shall be punctual in reporting for duty at the time and place designated by their supervisors.  Relieving personnel shall report for duty thirty (30) minutes prior to their assigned shifts for purposes of review.  Failure to report on time for duty, without prior notification to a supervisor, or without due cause, will be grounds for disciplinary action and shall be deemed neglect of duty."

While the Policy Manual was not updated during Klaus's employment, Section 6.034 has never been enforced by the Sheriff's Office and Lt. Col. Ibberson has never told any employee that they had to come in early for any reason and those employees who did come in early would also leave early.  Klaus claims that this

policy of corrections officers coming into work 30 minutes before the start of the shift started long before May 2000. Not all of the corrections officers would come to work 30 minutes early. Klaus never submitted a claim for overtime under Sheriff Kahl that was denied.

There were never timecards or a timeclock to punch. If Klaus worked overtime, he completed a time sheet.

Klaus claims that throughout his entire employment, he never got a 30-minute lunch because he was required to perform a cell check every 30 minutes that took an average of 8 to 10 minutes. He was never entitled to paid lunch hours or breaks under his union contract. In February 2000, Klaus was a union steward and was part of a meeting with a prior sheriff discussing what union membership wanted in contract negotiations and Klaus requested that the Sheriff's Office pay employees for the lunch hour and breaks. Klaus ate and took breaks when he had time but claims that he never got 30 minutes.

Klaus would take smoke breaks that could have been ten minutes long at least every hour. He was told to fill out paperwork if he worked more than 8 hours a day so that he would be paid for his time. Klaus filled out the form every time he worked an extra shift or an extra hour. In August 2015, Klaus submitted a monthly time sheet accurately identifying the overtime he earned and requesting pay for 41 hours of overtime and he was paid for that time. Klaus never filled out an overtime slip

under Sheriff Kahl that was denied.  Klaus reviewed his time sheets for September and October 2015 listing comp time he earned and used and stated that the reports were accurate.

Union grievances over pay issue

During his employment, Klaus was subject to a Collective Bargaining Agreement between County of Macoupin/the Sheriff of Macoupin County and Policemen's Benevolent Labor Committee (CBA).  Article XII of the CBA – Hours of Work and Overtime provides in Section 1. Hours of Work, in relevant part, "Deputies will remain on 8-hour shifts, but will begin rotating days off . . . The Sheriff will meet and, if requested to, bargain any schedule changes with the Union prior to making any changes to schedules.  The Union shall have the right to bargain over any significant changes to schedules.   Any impasse resulting from such bargaining will be resolved in accordance with Section 14 of the IPLRA."

Article XII of the CBA – Hours of Work and Overtime provides in Section 2. Overtime, in relevant part, "Overtime will be paid for all hours worked beyond the normal work day (8, 10 or 12 hours), or beyond the normal work period of 160 hours in 28 days.  If they so desire, employees may elect to take compensatory leave time in lieu of overtime wages, holiday premium pay and vacant shift overtime pay and may accumulate such compensatory time up to sixty (60) hours."

Article XXI of the CBA—Miscellaneous in Section 3. Breaks, states in relevant part, "All employees covered by this Agreement shall receive a thirty (30) minute dinner break which shall be taken when duty allows."  In addition, two (2) breaks of twenty (20) minutes shall be allowed."

Article II of the CBA – Management Rights provides, in relevant part, "Except as specifically limited, by the express provisions of the Agreement, the Sheriff retains all traditional rights to manage and direct the affairs of the Sheriff's Department in all various aspects and to manage and direct employees, including but not limited to the following: . . . . to schedule and assign work; . . . to assign overtime; . . . to establish, change, combine or abolish positions and the job duties of any position in accordance with operational requirements.  The Sheriff expressly reserves the right under the agreement to exercise all management rights set forth in Section 4 of the Illinois Public Labor Relations Act."

Article X of the CBA – Dispute Resolution and Grievance Procedure describes how the grievance process works and provides, in relevant part, that a grievance is "any unresolved difference, complaint or dispute between the Employer and the Union or any employee regarding the application, meaning or interpretation of this agreement.  The grievance procedure is subject to, and shall not conflict with, any provisions in the Illinois Public Labor Relations Act."

Article X of the CBA also contains in Section 7 "Steps in grievance procedure" and provides a mandatory process by which disputes arising under the CBA "shall be resolved."

On August 10, 2004, Klaus brought a grievance under the CBA stating that he had to come into work 15 minutes early. Klaus was aware that employees did not come into work 15 minutes ahead of time and they were not disciplined.

Sheriff Gary Wheeler denied Klaus's grievance in 2004, but Klaus chose not to advance the grievance to step 2 because he felt that management looked down on grievances.

On September 23, 2004, Klaus filed a grievance with Sheriff Wheeler seeking payment of overtime for 16 days that he worked in August 2004 and came in 30 minutes early. The jail superintendent at the time, Robert Mertz, denied Klaus's grievance and Klaus did not take the grievance to step 2 and he was not paid for that time.

Klaus did not file any grievances under Sheriff Kahl's administration. He could not recall filing any grievances under Sheriff Albrecht's administration regarding his pay.

On October 21, 2015, Klaus gave a grievance to his union steward Lt. Ryan Dixon regarding payment of overtime for reporting to work 15 minutes prior to his shift starting and taking of breaks, but he never heard anything back from the union

or Sheriff's Office and no one in the Sheriff's Office ever told him they were aware of this grievance. The Defendants state that the Sheriff's Office never received the grievance. After learning of Klaus's intention to file a grievance, Lt. Dixon did not present the grievance to the Sheriff's Office because Klaus had submitted his notice to retire and was no longer considered a member of the union. Klaus did not file any grievances over his pay between 2004 and October 21, 2015.

Robert Eskew's deposition

Robert Eskew is retired from the Sheriff's Office. He was employed from September 23, 1992 to September 23, 2016. He was a corrections deputy working as a corrections officer. Eskew worked with Klaus the entirety of his employment.

Eskew testified that in March 2015, he walked into the control room as Sheriff Kahl was yelling at Klaus, screaming at him, threatening him, telling him if he did not want to do his job he should go home and quit wasting his time. Sheriff Kahl denies making this statement to Klaus. Both Klaus and Eskew (who did not support any candidate in the sheriff's election) were counseled for not noticing that inmates tried to escape from the jail during their shift.

Klaus's October 15, 2015 retirement

On October 15, 2015, while he was on vacation, Klaus notified Chief Deputy Quinn Reiher that as of October 25, 2015, he would be retiring from the Sheriff's Office. Chief Deputy Reiher did not ask and Klaus did not give a reason for retiring.

Sheriff Kahl did not know any of the circumstances of Klaus's retirement, does not recall speaking with him during that process and did not do an exit interview of Klaus.

Klaus claims he intended to work until he had put in 30 years or until full retirement age for social security but had to retire at age 58. Dr. John Navin is Dean and Professor of Economics at Ohio Northern University. Dr. Navin is qualified to place a valuation on the economic loss to an individual resulting from early retirement. Dr. Navin also gives a loss figure for unpaid work time of $50,693.17. This did not involve any analysis or consideration of a separate overtime calculation. The Defendants dispute the assertion and say Klaus voluntarily retired and his alleged damages have no bearing on any of the issues in Defendants' motion for summary judgment.

## II.    DISCUSSION

Plaintiff Robert Klaus asserts claims for wrongful termination under § 1983 (Count I) and a wage claim under the Illinois Labor Act (Count II).

The Defendants move for summary judgment, alleging the § 1983 First Amendment retaliation claim fails because Klaus did not suffer an adverse action and was not constructively discharged. Moreover, the First Amendment activity was not a motivating factor in any retaliatory act. The Defendants further assert Sheriff

Kahl is entitled to qualified immunity. They assert the wage claim should have been brought through Kahl's union contract.

Klaus asserts there are genuine issues of material fact which preclude the entry of summary judgment.

<u>Legal standard</u>

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The Court construes all inferences in favor of the non-movant. *See Siliven v. Indiana Dept. of Child Services*, 635 F.3d 921, 925 (7th Cir. 2011). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor. *See id.*

<u>First Amendment retaliation</u>

(1)

In a First Amendment retaliation case, a plaintiff must present evidence that (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation that would likely deter protected speech; and (3) the protected speech was a motivating factor in the deprivation. *See Harnishfeger v. United States*, 943 F.3d 1105, 1112 (7th Cir. 2019). If the plaintiff meets these elements, the burden shifts to the public employer which must show that it would have inflicted the deprivation anyway. *See id*. at 1112-13. If the defendant makes that showing, "the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." *See Milliman v. County of McHenry*, 893 F.3d 422, 431 (7th Cir. 2018).

Political affiliation is activity that is protected by the First Amendment. *See Carlson v. Gorecki*, 374 F.3d 461, 464 (7th Cir. 2004). Because Sheriff Kahl knew that Klaus supported his opponent in the 2014 election, there is no dispute that Klaus is able to meet the first element. The Parties dispute whether Klaus suffered any deprivation that would likely deter free speech and whether Klaus's political support for Sheriff Kahl's opponent was a motivating factor in any decision by the sheriff that could be considered retaliatory.

"A § 1983 retaliation claim does not require an adverse employment action within the same meaning as other anti-discrimination statutes." *Hutchins v. Clarke*, 661 F.3d 947, 956 (7th Cir. 2011). "To determine whether an action is sufficiently adverse, it must present an actual or potential danger of deterring or chilling the plaintiff's exercise of free speech." *Graber v. Clarke*, 763 F.3d 888, 899 (7th Cir. 2014).

(2)

Klaus claims he was approached by the union steward months before the election and asked to sign a no confidence petition as to Sheriff Albrecht, whose reelection the union opposed. He asserts this forced the employees to take a position and that Kahl was keeping score. Klaus refused to sign. The Defendants allege Kahl has not shown that Sheriff Kahl was aware of this proposal by the union or Klaus's opposition to the vote.

Klaus then put an Albrecht campaign sign in his yard. Because Kahl lived only two blocks away in a small town, he knew Klaus supported his opponent. The Defendants do not dispute Kahl knew Klaus supported his opponent.

Klaus acknowledges Albrecht gave him a major promotion to sergeant with a big pay raise as a reward for his loyalty. He describes the promotion as "clearly political" and that nothing happens in the Macoupin County Sheriff's Department that is not politically driven.

Klaus alleges Kahl appeared to be upset over the promotion.  Kahl claims he did not care.  The Defendants allege that even if Kahl was upset by this development (which should have concerned all Macoupin County taxpayers), Sheriff Kahl did not demote Klaus or reduce his pay upon taking office.

Klaus further asserts Sheriff Kahl berated him in front of his co-workers, telling him he was a do-nothing and should just go home and do nothing.  The Defendants allege Sheriff Kahl was upset and may have yelled at both Klaus and the other deputy then on duty, Robert Eskew (who did not support any candidate in the election), because they failed to detect inmates trying to escape from the jail.  Nothing suggests Kahl disciplined Klaus or yelled at him because of his political support of the former sheriff.

Klaus alleges his immediate supervisor, Lt. Col. Ibberson, warned Klaus this was going to be a long road and it would be a tough haul.  Klaus says this sent a clear message.  The Defendants state that, assuming this occurred, it occurred on one occasion over ten months.  Moreover, Lt. Col. Ibberson did not recall ever making that statement but said there were a number of misunderstandings between him and other employees when he first became jail superintendent.  Ibberson claims other employees erroneously thought he was best friends with Sheriff Kahl.  However, Ibberson testified he did not campaign for Kahl and did not know he was going to

take the job until after Kahl was elected. Ibberson further testified he was instructed to straighten up the jail and that's what he did.

Klaus claims the write-ups began with each being more menacing in tone. The final one promised suspension or discharge as the next step. There were four write-ups in succession. This was more than he had in the previous 20 years. Klaus asserts the Sheriff revealed his agenda when he told Klaus he was a do-nothing and should be at home doing nothing.

The Defendants claim Klaus's assertion about the write-ups is not persuasive. Virtually every employer in the county warns employees who receive write-ups that further violations may result in progressive discipline. They allege the Macoupin County Sheriff's Office is no different, but unlike at-will employers, union employees in the Sheriff's Office have the benefit of extensive progressive discipline. This includes a verbal warning and three written warnings before receiving even a suspension, and after six months the discipline cannot be used as a basis for further discipline. Much of the alleged discipline that Klaus complains about either was not discipline or it followed a rules violation. The Defendants note that Klaus could not say how many written reprimands he received during his employment or if there were more than five.

Klaus alleges he knew there was trouble when, soon after the election, Sheriff Kahl came in the control room screaming at him. Co-worker Robert Eskew testified

he walked in, heard the screaming, was embarrassed over the incident and left.  Klaus claims Sheriff Kahl was conveying an ominous message—that he was a do-nothing employee who should retire and go home where he could do nothing.

Klaus alleges this incident was unprofessional, at best, if not blatantly abusive. No employee in a professional work environment—particularly a paramilitary organization like the Sheriff's Office—would expect insulting statements and such conduct from its leader.  Klaus asserts the interaction could not have served any legitimate corrective action.

Klaus next notes that John Pickett, like Klaus, had campaigned for Albrecht. When Pickett was in a room with other deputies and Kahl walked in soon after the election, Pickett rose and extended his hand and told Kahl congratulations. Klaus claims Kahl refused to shake his hand and told Pickett he was too old for the job, training him is a waste of time and money and he would hate his job.  He was told he would work weird shifts and be on call constantly.

Klaus claims that upon seeing how Pickett was treated, the message was clear—Kahl did not want anyone crossing him politically.  This concerned Klaus as well.  Klaus heard the warning of a rough road ahead if he did not retire and believed that trouble was ahead for him as well.

The Defendants note these statements allegedly caused Pickett to resign even though Kahl had not been elected sheriff yet and would not take office for eight

months. Moreover, no evidence shows that Kahl knew who Pickett politically supported or that the statements were related to his support of former Sheriff Albrecht. Moreover, Klaus testified he did not know when Pickett left the Sheriff's Office and did not know whether he left voluntarily. The Defendants further claim that because Sheriff Kahl allowed Klaus to work the shifts he wanted and sent him for training, Kahl's alleged statements to Pickett could not have dissuaded Klaus from politically supporting other people.

Klaus claims his conditions of employment had changed. He was written up for releasing a female after taking bond. Klaus says he was disciplined for not taking bond on a charge a dispatcher failed to catch.

Klaus contends the acts became so adverse as to chill the expression of free speech. He says he made the decision to retire under stress and the threat of discharge. Klaus claims his work environment had become unbearable and he reasonably concluded he was going to be fired. Each write-up became more ominous in tone with the last threatening the next step as discharge. The Defendants asserts the facts do not support these statements.

Klaus claims he saw that Sergeant George Griffith had been terminated and lost his pension as part of the discharge. He says he feared the same fate awaited him. The Defendants claim this affidavit contradicts his deposition and is irrelevant. Griffith was terminated by Sheriff Wheeler, one of Kahl's predecessors.

The Defendants further allege that from December 3, 2014 through Klaus's retirement letter on October 15, 2015, Kahl did not ever threaten to terminate Klaus, he never lost any income, he was never suspended and Klaus did not provide a reason why he was retiring. The Defendants claim his alleged duress from being ignored by Sheriff Kahl twice in ten months is not actionable.

(3)

Upon reviewing the record, the Court is unable to conclude Klaus suffered a deprivation that would likely deter protected speech. Despite the fact that Klaus was not a supporter of Sheriff Kahl, Klaus was not demoted after receiving what he admitted was a political promotion from the previous sheriff. The fact that Klaus and Sergeant Chiarodo were tasked with handling sex offender registrations for several months would not likely deter protected speech. Moreover, the Court is unable to find it was significant that Klaus, along with a number of other employees, had to take bond money after changes were made. It is fairly unremarkable that job duties might change from one administration to another.

Additionally, while Klaus disagreed with the July 21, 2015 written reprimand because he was not given information about the Montgomery County warrant, it would not have been unreasonable for him to check outstanding warrants. More significantly, he did not lose any money from the reprimand. Klaus had been written

up on other occasions and that did not dissuade him from supporting candidates. The previous sanctions also did not preclude him from being promoted to sergeant.

The Court is also unable to find that the alleged verbal abuse rises to the level to constitute a deprivation that would deter protected speech. One time that this occurred was when inmates had tried to escape and Sheriff Kahl apparently believed Klaus's shift was to blame. Given those circumstances, it appears Kahl may have had a legitimate basis to be upset. The fact that Kahl also yelled at Robert Eskew, who did not support any candidate for sheriff, suggests that any verbal abuse was not connected to protected speech.

The statements attributed to Lt. Col. Ibberson appear to be a case of an individual who is part of a new administration showing who is "boss." Statements that "it's a long road, and it's going to be a tough haul" and that "sergeants are going to start earning their pay" are relatively innocuous and the Court does not believe they would deter protected speech. *See e.g.*, *Long v. Hammer*, 727 F. App'x 215, 217 (7th Cir. 2018) (defendant's "yelling" at plaintiff was not unlawfully retaliatory because "simple verbal harassment" is insufficient to deter a person of ordinary firmness from submitting grievances).

The Seventh Circuit has recognized two types of constructive discharge. One involves when a plaintiff resigns because of discriminatory "working conditions even more egregious than that required for a hostile work environment claim."

*Fields v. Bd. of Educ. of City of Chicago*, 928 F.3d 622, 625 (7th Cir. 2019). "The second occurs when an employer acts in a manner that would make clear to a reasonable employee that she will be immediately fired if she does not resign." *Id.*

For many of the reasons previously stated, Klaus's constructive discharge claim fails because he has not shown that working conditions were so intolerable that his only choice was to quit. Klaus did not provide a reason for his retirement and Sheriff Kahl was unaware of the circumstances of his retirement. There is nothing in the record which suggests that Klaus had a reasonable belief he was about to be terminated at the time he submitted his resignation.

For all of these reasons, the Court concludes that Klaus has failed to show that he suffered an adverse action that would likely deter First Amendment activity.

The Court further finds that, even if Klaus presented sufficient evidence to show that an adverse action occurred, he has not produced evidence that his political support of Sheriff Kahl's opponent was a motivating factor in any of the allegedly adverse acts taken by the Sheriff's Office. Moreover, the Sheriff's Office had reasonable explanations for any actions taken and Klaus is unable to show pretext.

To the extent any claims are directed against Sheriff Kahl in his individual capacity, the Court finds that he is entitled to qualified immunity. Based on the applicable case law and the undisputed facts in this case, Kahl would not have been

aware that his conduct violated a clearly established right of which a reasonable person would have known.

(4)

Based on the foregoing, the Court concludes there are no genuine issues of material fact and the Defendants are entitled to summary judgment on Plaintiff Robert Klaus's First Amendment claim. Because all federal claims are being dismissed, the Court declines to exercise subject matter jurisdiction over the Plaintiff's supplemental state law wage discrimination claim. *See* 28 U.S.C. § 1367(c)(3).

Ergo, the Motion for Summary Judgment of Defendants Shawn Kahl and County of Macoupin [d/e 22] is GRANTED.

The Plaintiff's First Amendment retaliation claims are DISMISSED with PREJUDICE.

The Court relinquishes jurisdiction over the Plaintiff's state law claim.

The final pretrial conference set for March 24, 2020 and bench trial setting on April 7, 2020 are Canceled.

The Clerk will enter Judgment and terminate this case.

ENTER: February 5, 2020

FOR THE COURT:

/s/ *Richard Mills*
Richard Mills
United States District Judge